******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

TILCON CONNECTICUT, INC. *v.* COMMISSIONER
OF ENVIRONMENTAL PROTECTION
(SC 19203)

Palmer, Zarella, Eveleigh, McDonald, Espinosa and Robinson, Js.

*Argued December 5, 2014—officially released July 28, 2015*

*Timothy S. Hollister*, with whom were *Aaron D. Levy*
and, on the brief, *Beth Bryan Critton*, for the appellant-
appellee (plaintiff).

*David H. Wrinn*, assistant attorney general, with
whom, on the brief, was *George Jepsen*, attorney gen-
eral, for the appellee-appellant (defendant).

*Daniel J. Krisch* and *Ann M. Catino* filed a brief for
the Connecticut Business and Industry Association as

amicus curiae.

*Elizabeth C. Barton* and *Rene A. Ortega* filed a brief for the Home Builders and Remodelers Association of Connecticut, Inc., et al. as amici curiae.

*Opinion*

EVELEIGH, J. The plaintiff, Tilcon Connecticut, Inc., an earth materials excavation and processing company, petitioned the defendant, the Commissioner of Environmental Protection (commissioner), for a declaratory ruling defining the scope of the authority possessed by the Department of Environmental Protection (department)[1] to request certain information from the plaintiff for its various water diversion permit applications pursuant to the Connecticut Water Diversion Policy Act (water diversion act), General Statutes § 22a-365 et seq.[2] The plaintiff appealed the commissioner's declaratory ruling, which deemed all of the department's actions authorized under the water diversion act, to the trial court pursuant to General Statutes §§ 4-176 (h) and 4-183 (a). The plaintiff now appeals from the judgment of the trial court, which endorsed in all material respects the commissioner's interpretation of the water diversion act,[3] claiming that the trial court improperly: (1) construed the water diversion act as essentially granting the department jurisdiction and authority over all environmental resources and issues, including jurisdiction and authority over the plaintiff's excavation activities, pertaining to the entirety of its properties, even though a large percentage of those resources and issues are, according to the plaintiff, hydraulically unrelated to the proposed water diversions for which the plaintiff requests permits; (2) construed the water diversion act as allowing the department to effectively reopen duly issued municipal wetlands permits by demanding a wetlands mitigation plan for excavations previously authorized by such permits; and (3) upheld the department's authority to delay processing the renewal of the plaintiff's National Pollutant Discharge Elimination System (NPDES) permit until it provided the department with the information requested in connection with its permit applications under the water diversion act. We conclude that the water diversion act does not authorize the department's attempts to regulate the plaintiff's excavation activities because those activities are neither diversions within the scope of the plaintiff's permit applications nor properly viewed as *effects* of the diversions for which permits were sought. We also agree with the plaintiff that the water diversion act does not authorize the department to request a wetlands mitigation plan for the alteration of wetlands that had been authorized by prior municipal wetlands permits, and that the department may not delay processing the plaintiff's NPDES permit application due to a pending water diversion permit application. Therefore, we reverse the judgment of the trial court and remand the case with direction to sustain the plaintiff's appeal.

To provide some context for the issues in the present case, we begin by setting forth the basic framework of

the water diversion act. The water diversion act was enacted to "[protect] the water resources of the state . . . ." General Statutes § 22a-366.[4] It requires, among other things, a permit for any diversion of the water contained within, flowing through, or bordering upon this state. See General Statutes §§ 22a-367 (9) and 22a-368 (b).[5] Although the water diversion act defines " '[d]iversion' " to include effectively any activity that changes the flow of any amount of water; General Statutes § 22a-367 (3); it thereafter significantly narrows the scope of the activities requiring permits by way of exemptions. See General Statutes § 22a-377 (a).[6] To obtain a permit to divert water, an applicant must provide the department with information "the commissioner deems necessary to fulfill the purposes of [the water diversion act]," including, but not limited to, a series of enumerated items relating to the nature of the diversion and the effect thereof on water resources. General Statutes § 22a-369.[7] In acting on a completed application, the commissioner must consider a variety of factors that make use of the information required in a permit application. General Statutes § 22a-373 (b).[8] The commissioner may grant a permit for a period not to exceed twenty-five years. Regs., Conn. State Agencies § 22a-377 (c)-2 (h) (1). We explore the water diversion act in greater detail in part IV B of this opinion.

I

FACTS AND PROCEDURAL HISTORY

The undisputed facts of the present case are set forth in the declaratory ruling issued by the commissioner, which we will supplement, as needed, by the administrative record. The plaintiff owns facilities used for earth materials excavation and processing located on properties in Plainfield, Wallingford, Montville, Griswold, and North Branford. To conduct its excavation activities, the plaintiff has obtained a variety of permits, other than the water diversion permits at issue in the present case, from various federal, state, and local agencies.

In 2003, the plaintiff submitted to the department five individual applications for water diversion permits, one application for each of its five facilities, for the maximum twenty-five year period. Each of the diversions for which the plaintiff sought permits—specifically, two withdrawals of water from wells and eight withdrawals of water from manmade surface basins located at lower elevations on its sites—had already been in existence for several years and, in some instances, decades. The plaintiff sought permits for them at this time in response to the enactment of General Statutes § 22a-368a,[9] which clarified that the water diversion act's permitting requirements applied to diversions predating its enactment and provided amnesty for those who remedied noncompliance with permitting requirements within a certain time period. Each of the plaintiff's withdrawals of water enables it to excavate and process earth materi-

als on its properties. The plaintiff uses the water from these ten sources for quarry operations, including washing aggregate, processing stone sand, cooling equipment, and suppressing dust. Although these diversions *enable* the plaintiff's excavation activities on its sites, the water is not used *directly* to excavate or extract earth materials from the resources on its sites.

In each of its applications, the plaintiff detailed the use and source of the withdrawn water. As for use, the plaintiff classified each permit as one for the diversion of water for consumptive use—as opposed to nonconsumptive use—despite the fact that it used much of the withdrawn water in "closed loop" systems, meaning that the water used would be returned to its original source, with minimal consumption or evaporation of water in the process. Some of the withdrawn water was, however, directly consumed for uses such as dust suppression and was not returned to its source. Each water source was located completely on the plaintiff's property and was supplied primarily by stormwater and, to some extent, groundwater seepage. The basins and wells were not supplied by water from watercourses, public or private drinking supplies, or recreation areas.

The plaintiff included with its applications information to demonstrate its compliance with various laws. It attached a listing of all federal, state, and local permits already issued or pending for the site or proposed activity. It also provided a description of whether the proposed diversion would provide instantaneous flow or release of surface waters in the natural downstream direction below the diversion and, if so, whether such release was authorized by an NPDES permit. NPDES permits are required pursuant to the federal Clean Water Act (clean water act); 33 U.S.C. § 1342; and General Statutes § 22a-430, which "require any person or municipality to obtain a permit prior to discharging any substance into the waters of the United States or Connecticut. In Connecticut, the department is responsible for issuing both federal and state discharge permits." (Internal quotation marks omitted.) *Burton* v. *Commissioner of Environmental Protection*, 291 Conn. 789, 793 n.4, 970 A.2d 640 (2009). The plaintiff's application for the North Branford site was the only diversion for which the plaintiff sought a permit that resulted in a discharge requiring an NPDES permit. In that application, the plaintiff described how the North Branford quarry collects stormwater that must be pumped out of the quarry and discharged into a series of sedimentation basins, where it later flows into a pond. The application noted that the collection and discharge of this stormwater into the pond had been authorized by an NPDES permit.

The plaintiff included a variety of other materials in support of its applications, including environmental reports.[10] In those reports, the plaintiff generally

described existing ecological conditions and wildlife habitat characteristics at the entireties of the sites, but provided more specific information only for those areas adjacent to existing water withdrawals because it calculated, by way of the "area of influence,"[11] that the withdrawals were minimal and not anticipated to have an effect on ecological conditions on remote areas of the properties.

Three years after submission of the permit applications, on July 18, 2006, the plaintiff received a letter from the department requesting additional information for all five of the plaintiff's applications. The department requested comprehensive information about the plaintiff's excavation activities for the duration of the requested permits, namely, twenty-five years. Specifically, the department requested "a site plan which details the overall proposed limits of earthwork, including but not limited to, excavation of sand and gravel deposits, construction of roadways, soil stabilization measures and wetland/watercourse and associated buffer areas, at the identified project sites . . . ." The department stated that the site plan "must include . . . [t]he location and extent of inland wetland and watercourses, endangered, threatened and special species habitats; and significant natural communities; [t]he location and extent of buffer areas provided to protect [these resources]; [a]dequate erosion and sedimentation controls . . . for all phases of development; [r]estoration and [e]nhancements of existing ponds, wetlands and watercourses utilized for sand and gravel processing to maximize wetland functions and values; [a]dequate stormwater control measures . . . for all phases of development and [f]inal stabilization measures for the completed site development."

In support of its request, the department stated that, "[s]ince the authorization of the proposed water supply systems will facilitate the continued mining activities and earth product processing at the project sites, [department] staff need[s] the aforementioned site development plans to fully assess the long-term effects of the proposed diversion on inland wetlands and watercourses, fish and wildlife and water quality."

The plaintiff did not fully comply with the department's request. Instead, by way of a letter dated March 28, 2007, the plaintiff expressed its disagreement with the department's claim that the "effect of the proposed diversion" could extend, geographically and temporally, to the proposed limits of its excavation activities for the next twenty-five years. The plaintiff claimed that the "effect of the proposed diversion" was only those portions of the properties that "are, or are reasonably expected to be, affected by an actual diversion of water, [which it claimed was] the 'area of influence' of such diversion, or in the case of a quarry where the stormwater collection exceeds [100] acres, the downstream

impact."[12] The plaintiff relied on this "area of influence" metric even though, as will be discussed in further detail in part IV B of this opinion, the water diversion act makes no express reference to "area of influence." With respect to information about its excavation activities for the full twenty-five year period, the plaintiff claimed that it could not, in any event, forecast the extent of its "site operations [that far] into the future [because they are] based on the regional business climate and restrictions mandated by local agencies" from which it obtains its excavation permits.[13] In accordance with its own interpretation of the department's authority, the plaintiff submitted "all of the additional information requested by the [department] in 2006 *with respect to the area of influence or discharge of each diversion*, as the applicant has calculated it."[14] (Emphasis added.)

In a letter dated October 21, 2008, which is central to the declaratory ruling that followed, the department claimed that it had jurisdiction *and* authority over *all* of the plaintiff's site activity, which "*includes* the withdrawal of water from on-site basins," indicating that the department considered the plaintiff's activities *other than* the withdrawals of water for which the plaintiff sought permits—its excavation and earth removal activities—to be properly within the department's jurisdiction and authority. (Emphasis added.) In the letter, the department asserted that, once the plaintiff's withdrawals of water triggered the department's jurisdiction, its "scope of review when determining whether [the plaintiff's] application is complete is broad as the [d]epartment is statutorily authorized to review, among other factors, the effects [the plaintiff's] activity may have on wetlands or wildlife . . . [and] the possible environmental impacts of the diversion activity (which, in this case, would be [the plaintiff's] activity at all five sites) . . . ." The department then requested even more information for all five of the plaintiff's permit applications so that it could "cohesively manage and protect our natural resources." The department's requests focused almost exclusively on various aspects of the plaintiff's excavation activities, with the geographic scope of its requests extending to the "existing limits of the processing and excavation areas and any areas proposed to be disturbed for the duration of the permit."[15] In addition to the vast amount of information the department requested about the plaintiff's excavation activities on all five of the properties, the department also requested information specific to the plaintiff's North Branford facility on two matters. First, the department requested "[a] wetland[s] mitigation plan to offset the approximately [twelve] acres of inland wetlands that have been destroyed by the post-1990 expansion of the quarry" pursuant to permits issued by the North Branford Inland Wetlands and Watercourses Agency (North Branford wetlands agency) in 1974 and 1984. Second, the department requested information about

the plaintiff's discharge of quarry stormwater authorized pursuant to the plaintiff's NPDES discharge permit.[16] The plaintiff's application for a renewal and modification of the NPDES permit had been pending before the department since 1998. Following the plaintiff's submission of the North Branford diversion permit application in 2006, the department informed the plaintiff that it would process the NPDES and diversion permit applications concurrently.[17]

Instead of submitting the requested information, in 2009, the plaintiff filed a petition for a declaratory ruling to address the scope of the department's authority to request information for the plaintiff's water diversion permit applications.[18] The plaintiff sought a ruling by the commissioner as to three questions: (1) as to all five facilities, "[w]hen processing an application for a water diversion permit, does the [department] have jurisdiction and authority[19] to consider all potential environmental resources and issues to the entire site on which the diversion is located, even if those other resources and issues are hydraulically unrelated to the diversion or are committed by statute or regulation to other [department] bureaus or regulatory agencies?"; (footnote added); (2) as to North Branford property, "[w]hen an applicant for a water diversion permit already has obtained a local wetlands permit for activities that are located on the diversion site but are hydraulically unrelated to the diversion, may the [department], processing a diversion permit application, demand information regarding such wetlands and regulated activities and regulate those activities again?"; and (3) as to North Branford property, "[m]ay the [department] decline to process or delay processing an NPDES permit renewal on the ground that the applicant has not supplied to the [department] requested additional information regarding a pending water diversion permit application?" The plaintiff and the department stipulated to the facts and exhibits to be considered by the commissioner.

In the declaratory ruling, the commissioner began by concluding that the first question in the petition had not been framed properly and decided instead to use the department's October 21, 2008 letter as a reference point for her ruling, though she did not specifically reformulate the petition question. The commissioner then answered all the questions presented by the petition in the affirmative, interpreting the water diversion act as authorizing all of the department's requests for information in the letter. As to the first question about the information requested for all five facilities, the commissioner explained that the water diversion act conferred broad authority on the department to request information about activities beyond the specific withdrawals for which the plaintiff sought diversion permits because the plaintiff's excavation activities, themselves, might be diversions. The commissioner also explained

that, even if the excavation activities were not, themselves, diversions, they were an "effect" of the plaintiff's proposed diversions because the plaintiff's withdrawals of water facilitated and enabled the plaintiff's excavation activities, in that the plaintiff would be unable to conduct any of its excavation activities if it did not have the diverted water it needed to cool its excavation machines, suppress dust, and wash aggregate. Because the excavation activities were an "effect" of the diversion, the commissioner reasoned that the department could properly request information about the effect of the excavation activities on environmental resources for the entirety of the plaintiff's proposed excavation sites for the next twenty-five years.

The commissioner resolved the second petition question—whether the department could properly request a mitigation plan for wetlands alterations authorized by prior municipal wetlands permits for the North Branford property—by concluding that the department exercises overlapping jurisdiction with the North Branford wetlands agency and that, therefore, the department could properly request a wetlands mitigation plan. The commissioner reasoned that the water diversion act grants the department "separate and broad authority to review the wetlands impacts of diversion activities," as evidenced by the legislature's failure to include activities already permitted by local wetlands commissions among the exemptions from the water diversion act.

Finally, as to the third question, the commissioner concluded that, under § 22a-430-4 (d) (3) of the Regulations of Connecticut State Agencies, a regulation promulgated by the department in implementing the clean water act, the department could delay processing a completed NPDES permit application when a related permit application is incomplete or may be denied. The commissioner reasoned that, because the water withdrawn from the North Branford quarry pursuant to the water diversion permit would be discharged pursuant to the NPDES permit, the two permit applications were related for purposes of the regulation.

The plaintiff appealed from the declaratory ruling to the trial court pursuant to §§ 4-176 (h) and 4-183 (a). As to all three questions, the trial court construed the water diversion act in a similar manner to how the commissioner had construed it. The trial court determined, however, that the commissioner needed to make findings as to "where these specific diversions are for the purposes of discovery" with respect to the plaintiff's diversion permit application.[20] Accordingly, the trial court rendered judgment dismissing the plaintiff's appeals as to the second and third questions but remanded the case to the commissioner for "factual findings on the plaintiff's diversion permit application" as to the first question. This appeal followed. Additional facts will be set forth as needed.

On appeal to this court, the plaintiff claims that the trial court improperly: (1) construed the water diversion act as essentially granting the department jurisdiction and authority over all environmental resources and issues, including the plaintiff's excavation activities, pertaining to the entirety of its properties, even though a large percentage of those resources and issues are, according to the plaintiff, hydraulically unrelated to the proposed water diversions for which the plaintiff has requested permits; (2) construed the water diversion act as allowing the department to effectively reopen duly issued municipal wetlands permits by demanding a wetlands mitigation plan for excavations previously authorized by such permits; and (3) affirmed the department's authority to delay processing the plaintiff's application to renew its NPDES permit until it provided the department with the information requested in connection with its permit applications under the water diversion act. The commissioner urges this court to affirm the trial court's judgment deeming the commissioner's interpretation of the water diversion act proper as to all three questions.

We conclude that, in the context of the plaintiff's applications, the water diversion act does not authorize the department's attempts to seek information about, and thereby effectively regulate, the plaintiff's excavation activities as diversions separate and apart from the withdrawals for which the plaintiff seeks permits, nor does it authorize the department's attempts to regulate the plaintiff's excavation activities as an "effect" of the proposed diversions. We also agree with the plaintiff that the water diversion act does not authorize the department to request a wetlands mitigation plan for the alteration of wetlands authorized by prior municipal wetlands permits and that the department may not delay processing the plaintiff's NPDES permit application due to the pending water diversion permit application. We will address each claim in turn, beginning with the threshold issue of subject matter jurisdiction.

II

FINAL JUDGMENT

As a threshold issue of appellate jurisdiction, we discuss whether the trial court's judgment is an appealable final judgment in light of its remand order for factual findings as to the first question in the declaratory ruling. See *State* v. *Curcio*, 191 Conn. 27, 30, 463 A.2d 566 (1983) ("[b]ecause our jurisdiction over appeals . . . is prescribed by statute, we must always determine the threshold question of whether the appeal is taken from a final judgment before considering the merits of the claim"). Both parties contend that the decision of the trial court constitutes a final judgment for the purpose of appeal, and we agree.

The appeal in the present case is governed by the

Uniform Administrative Procedure Act (UAPA), General Statutes § 4-166 et seq. It is well settled that "[t]he legislature may . . . deem otherwise interlocutory actions of the trial courts to be final judgments, as it had done by statute in limited circumstances." *Abreu* v. *Leone*, 291 Conn. 332, 338, 968 A.2d 385 (2009); see, e.g., General Statutes § 4-183 (j) (deeming remand order issued by trial court to be final judgment where trial court finds "that substantial rights" of person appealing "have been prejudiced" by error in administrative ruling). "Alternatively, the courts may deem interlocutory orders or rulings to 'have the attributes of a final judgment' if they fit within either of the two prongs of the test set forth in [*Curcio*]. . . . Under *Curcio* . . . interlocutory orders are immediately appealable if the order or ruling: (1) terminates a separate and distinct proceeding or (2) so concludes the rights of the parties that further proceedings cannot affect them." (Citations omitted.) *Abreu* v. *Leone*, supra, 338–39. If an administrative appeal governed by the UAPA contains a remand order, inquiry is properly made into whether the remand falls within § 4-183 (j), rendering it a final judgment by statute "irrespective of both the nature of the remand and the administrative proceedings that are expected to follow it." (Emphasis omitted; internal quotation marks omitted.) *Hogan* v. *Dept. of Children & Families*, 290 Conn. 545, 558, 964 A.2d 1213 (2009), quoting *Commission on Human Rights & Opportunities* v. *Board of Education*, 270 Conn. 665, 675, 855 A.2d 212 (2004). When the remand falls outside of § 4-183 (j), a final judgment exists if the decision rendered by the trial court satisfies either prong of *Curcio*. See *Hogan* v. *Dept. of Children & Families*, supra, 556–60.

In the present case, irrespective of whether the remand would fall within § 4-183 (j), the trial court's decision plainly satisfies *Curcio*. Although the trial court ordered a remand for factual findings, it affirmed the declaratory ruling in all substantive respects.[21] The trial court's unqualified agreement with the commissioner's interpretation of its authority as set forth in declaratory ruling, coupled with the fact that any proceedings upon remand would have involved the application of that interpretation, leads us to conclude that the trial court implicitly determined that the record was sufficient to provide a proper basis for the issuance of the declaratory ruling. As aptly noted by the plaintiff, "[t]hat the trial court fashioned a remand order purporting to govern further inquiry into regulated diversions does not undermine the finality of its adjudication of the scope of the act under which that inquiry would occur." Therefore, we conclude that the trial court's judgment, as a whole, had so concluded the rights of the parties such that further proceedings could not affect them as it pertained to the declaratory ruling and, thus, constitutes a final judgment under the second prong of *Curcio*.

## III

## STANDARD OF REVIEW

We next set forth the standard of review. "Administrative agencies . . . are tribunals of limited jurisdiction and their jurisdiction is dependent entirely upon . . . the statutes vesting them with power and they cannot confer jurisdiction upon themselves. . . . We have recognized that [i]t is clear that an administrative body must act strictly within its statutory authority, within constitutional limitations and in a lawful manner. . . . It cannot modify, abridge or otherwise change the statutory provisions . . . under which it acquires authority unless the statutes expressly grant it that power." (Internal quotation marks omitted.) *Celentano* v. *Rocque*, 282 Conn. 645, 654, 923 A.2d 709 (2007). We must therefore interpret the statutory provisions under which the department acquires its authority.

The scope of the department's authority under the water diversion act presents a question of law. "Cases that present pure questions of law . . . invoke a broader standard of review than is . . . involved in deciding whether, in light of the evidence, the agency has acted unreasonably, arbitrarily, illegally or in abuse of its discretion." (Internal quotation marks omitted.) *Dept. of Public Safety* v. *Freedom of Information Commission*, 298 Conn. 703, 716, 6 A.3d 763 (2010). "Although the interpretation of statutes is ultimately a question of law . . . it is well established practice of this court to accord great deference to the construction given [a] statute by the agency charged with its enforcement." (Internal quotation marks omitted.) *Celentano* v. *Rocque*, supra, 282 Conn. 652.

"We have determined [however] that the traditional deference accorded to an agency's interpretation of a statutory term is unwarranted when the construction of a statute . . . has not previously been subjected to judicial scrutiny [or to] . . . a governmental agency's time-tested interpretation . . . . [A]n agency's interpretation of a statute is [time-tested] when the agency's interpretation has been formally articulated and applied for an extended period of time, and that interpretation is reasonable." (Citations omitted; footnote omitted; internal quotation marks omitted.) *Hartford* v. *Hartford Municipal Employees Assn.*, 259 Conn. 251, 261–62, 788 A.2d 60 (2002); see also *Sarrazin* v. *Coastal, Inc.*, 311 Conn. 581, 611 n.20, 89 A.3d 841 (2014) ("[a] consideration of whether an interpretation is time-tested takes into account both the length of time since it first was articulated and the number of formal decisions applying that interpretation").

The parties do not dispute that the department's interpretation of the water diversion act has never been subjected to judicial scrutiny. The commissioner does claim, however, that the department's interpretation

of the water diversion act should be entitled to some measure of deference by this court because, in applying the water diversion act, it has: (1) consistently required information from other applicants for water diversion permits that was similar to the category and extent of information requested in the October 21, 2008 letter; and (2) consistently evaluated the direct *and indirect* effects of proposed diversions in acting on diversion permit applications. In support of this claim, the department submitted excerpts from various permit review processes, including correspondence and other internal memoranda, for a variety of applicants seeking diversion permits from the department.[22] Although the commissioner pointed to the department's "consistency in requesting comprehensive site information before issuing diversion permits" from other "applicants for large-scale projects that require diversion permits," the trial court concluded that the department's interpretation was not entitled to special deference and we agree.

The department's interpretations of the water diversion act in the record do not amount to a time-tested interpretation because they have been neither formally articulated nor adopted pursuant to formal rule-making or adjudicatory procedures; they include private correspondence and internal documents. Accordingly, we do not accord them any deference. See *Sarrazin* v. *Coastal, Inc.*, supra, 311 Conn. 610–11 ("[t]he requirements that an interpretation be 'formally articulated and applied for an extended period of time' provide a proper basis for deference because, like judicial review, they ensure that the interpretation is articulated through procedures that allow for robust adversarial testing and in a manner that has general applicability").

Because we need not accord the department any deference in construction of the statutory provisions at issue, our review is plenary. *Celentano* v. *Rocque*, supra, 282 Conn. 654. "The process of statutory interpretation involves the determination of the meaning of the statutory language as applied to the facts of the case, including the question of whether the language does so apply. . . . When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In seeking to determine [the] meaning [of the statutory language] . . . [we] first . . . consider the text of the statute itself and its relationship to other statutes." (Internal quotation marks omitted.) *Sams* v. *Dept. of Environmental Protection*, 308 Conn. 359, 377–78, 63 A.3d 953 (2013); see also General Statutes § 1-2z. "Furthermore, we interpret statutory language in light of the purpose and policy behind the enactment." *Willow Springs Condominium Assn., Inc.* v. *Seventh BRT Development Corp.*, 245 Conn. 1, 26, 717 A.2d 77 (1998). Since all issues discussed involve our statutory construction of the water diversion act and other relevant environmental statutes and regulations, our standard of review is

the same for all three questions.

IV

SCOPE OF THE DEPARTMENT'S AUTHORITY

UNDER THE WATER DIVERSION ACT

Turning to the merits of the plaintiff's appeal, the plaintiff first claims that the commissioner and the trial court interpreted the department's authority under the water diversion act too broadly. In essence, the plaintiff claims that the department may not request information concerning, or regulate, the plaintiff's excavation activities in the context of its applications for permits for withdrawals of water. The commissioner responds that this court should affirm the interpretations of the water diversion act endorsed by the trial court that would allow it to do so. We discuss, first, whether we must reframe the plaintiff's first petition question, and, thereafter, our construction of the water diversion act.

A

Reframing the Question Presented

The question as originally drafted by the plaintiff asks whether the department has jurisdiction and authority "to consider all potential environmental resources and issues to the entire site on which the diversion is located, even if those other resources and issues are hydraulically unrelated to the diversion or are committed by statute or regulation to other [department] bureaus or regulatory agencies." The commissioner declined to answer the question as framed and instead used the department's October 21, 2008 letter as a reference point for the declaratory ruling, but did not explicitly formulate a substitute question. The plaintiff generally asserts that any deviation from the question as worded perpetuates the mischaracterization of the issue before the court. We conclude that, for us to fairly address the parties' claims, we must reframe the question presented.

The first question presented in the plaintiff's petition for a declaratory ruling, as drafted by the plaintiff, is inaccurate because we cannot answer it without: (1) assuming that the department has, through its actions, attempted to consider every potential environmental resource and issue on the literal entirety of each of the plaintiff's sites; or (2) assuming the question's own conclusion because the question presupposes that all information requested by the department is, in fact, "hydraulically unrelated" to the proposed diversion, a term that itself is subject to various meanings. The commissioner, the trial court, and even the plaintiff have not attempted to answer the question as drafted because it does not fully reference the facts and circumstances of the present case, nor could its answer properly address the evolving arguments of the parties to these proceedings.[23]

The crux of the parties' dispute centers around the department's requests in the October 21, 2008 letter, specifically the department's requests for information about the plaintiff's excavation activities, which resulted in the department's request for an almost site-wide resource inventory. We glean from the declaratory ruling that the commissioner reframed the first question presented in the plaintiff's petition to reference the department's October 21, 2008 letter, addressing whether, in the context of the permit review process for the plaintiff's applications for the withdrawal of water, the water diversion act authorizes the department to request information concerning, and essentially regulate, the plaintiff's excavation activities and the environmental effects of those activities. In light of the commissioner's conclusion that it could not address the question as framed and both parties' evolving positions during the course of these proceedings, we adopt this iteration of the question. See *Gianetti* v. *Norwalk Hospital*, 211 Conn. 51, 57, 557 A.2d 1249 (1989) (reframing reservation requested by parties pursuant to General Statutes § 52-235 because questions reserved were framed too broadly and noting that it was proper because of "the importance of the issues involved and the fact that the claims of the parties have been fully presented in argument and brief" [emphasis omitted; internal quotation marks omitted]), quoting *General Motors Corp.* v. *Mulquin*, 134 Conn. 118, 133, 55 A.2d 732 (1947); *Republican Party of Connecticut* v. *Merrill*, 307 Conn. 470, 473 n.3, 55 A.3d 251 (2012) (reframing question presented in declaratory action treated as administrative appeal pursuant to § 4-176 [a] to "more accurately reflect the question presented in light of the arguments" of parties).

B

Construction of the Water Diversion Act

We now turn to the merits of the plaintiff's first petition question: whether, in the context of the permit review process for the plaintiff's applications for withdrawals of water, the water diversion act authorizes the department to request information concerning and, in essence, regulate the plaintiff's excavation activities and the environmental effects of those activities. The plaintiff contends that the department is limited to requesting information relating only to the diversions for which permits are sought and the effects of those specific diversions on water resources or matters related thereto, as set forth by statute, within the area of influence of the proposed diversions. The commissioner asserts that the plaintiff's submission of the applications gave the department jurisdiction and authority over the excavation activities either as diversions themselves or as effects of the proposed diversions. Although we do not wholly endorse either party's construction, we conclude that this question must be answered in

the negative on the basis of the water diversion act, viewed in its entirety.

We begin with a discussion of the regulatory scheme. We then explain why this scheme does not authorize the department to regulate the plaintiff's excavation activities either as: (1) diversions distinct from those for which the plaintiff has sought permits; or (2) an "effect" of the plaintiff's proposed withdrawals of water because such excavation activities are facilitated and enabled by the plaintiff's use of the withdrawn water. We then explain why the plaintiff's "area of influence" metric does not define the limits of the department's authority and, thereafter, discuss the department's reliance on this court's decision in *Unistar Properties, LLC* v. *Conservation & Inland Wetlands Commission*, 293 Conn. 93, 977 A.2d 127 (2009). Finally, we acknowledge the limits of this opinion.

As we explained previously in this opinion, the purpose of the water diversion act is to preserve water, "a precious, finite and invaluable resource upon which there is an ever increasing demand for present, new and competing uses . . . ." General Statutes § 22a-366. The legislature has "declared that the diversion of the waters of the state shall be permitted only when such diversion is found to be necessary, is compatible with long-range water resource planning, proper management and use of the water resources of Connecticut and is consistent with Connecticut's policy of protecting its citizens against harmful interstate diversions . . . ." General Statutes § 22a-366.

The water diversion act's definition of "[d]iversion" is undeniably broad: "*any activity* which causes, allows or results in the withdrawal from or the alteration, modification or diminution of the instantaneous flow of the waters of the state . . . ." (Emphasis added.) General Statutes § 22a-367 (2); see also General Statutes § 22a-367 (4) ("[i]nstantaneous flow" means "the volume of water that would occur in waters at a given point at any given moment"); General Statutes § 22a-367 (9) ("[w]aters" means "all tidal waters, harbors, estuaries, rivers, brooks, watercourses, waterways, wells, springs, lakes, ponds, marshes, drainage systems and all other surface or underground streams, bodies or accumulations of water, natural or artificial, public or private, which are contained within, flow through or border upon this state or any portion thereof"). Any activity that alters, at any moment, the volume of any accumulation of water contained within, flowing through, or bordering upon this state constitutes a diversion.

The legislature has exempted, however, certain diversions from the requirements of the water diversion act. See General Statutes § 22a-377 (a) (setting forth statutory exemptions);[24] General Statutes § 22a-377 (b) (empowering commissioner to adopt additional exemptions "which would not by themselves or in combination

with each other have a substantial effect on the long-range planning for and allocation of the water resources of the state"); Regs., Conn. State Agencies § 22a-377 (b)-1 (setting forth additional regulatory exemptions).

In managing the nonexempt diversions that require the department's oversight, the water diversion act requires the reporting to the department of operating data about the water usage of each diversion so that the department may determine, before issuing new diversion permits in any particular area, whether additional diversions will overburden the water resources in that area.[25] Indeed, before establishing the duration of each diversion permit, the department must consider "the extent to which the waters affected by such permit have already been allocated; [and] the uses to which such previously-allocated waters are put, including non-consumptive uses . . . ." Regs., Conn. State Agencies § 22a-377 (c)-2 (h) (1) (A) and (B).[26]

Two statutory provisions directly bear on the information that the department may request to decide whether to grant a permit. First, § 22a-369 requires a permit applicant to submit specific information to the department, which, broadly characterized, relates to the proposed diversion itself, the effect of the proposed diversion on water resources, and the alternatives, if any, to the proposed diversion. See General Statutes § 22a-369 (requiring information regarding, inter alia: "use of the diverted water"; "description of the existing water system where the diversion is proposed"; "locations of withdrawals"; "quantity, frequency and rate of water the applicant proposes to divert"; "length of time for which the diversion permit is sought"; information about "public water supplies, water quality, wastewater treatment needs, flood management, water-based recreation, wetland habitats, waste assimilation, agriculture, fish and wildlife and low flow requirements"; "[c]onservation measures . . . and the applicant's long-range water conservation plan").[27] Second, § 22a-373 addresses factors that the department must consider in acting on a completed water diversion application, which principally relate to water resources. See General Statutes § 22a-373 (b) (requiring review of relevant considerations, which include: "public water supply . . . safe yield of reservoir systems and reservoir and groundwater development"; "existing and planned water uses in the area affected such as public water supplies, relative density of private wells, hydropower, flood management, water-based recreation, wetland habitats, waste assimilation, and agriculture"; "long-range planning, management, allocation and use of the water resources of the state"; "existing water conditions"; "effect, including thermal effect, on fish and wildlife as a result of flow reduction, alteration or augmentation"; "navigation"; "conservation").[28] In addition to these enumerated matters, the water diversion act vests the department with a broad, residual grant of

authority to require the applicant to submit any information that it "deems necessary to fulfill the purposes of [the water diversion act]"; General Statutes § 22a-369; and to consider "any additional information that [it] deems necessary to carry out the purposes of [the water diversion act]." General Statutes § 22a-371 (a).

The water diversion act provides the department with a variety of other powers to implement its provisions, including enforcement powers. If any person or municipality conducts activities that constitute a diversion without a permit, the legislature empowered the department to "request the Attorney General to bring an action . . . to enjoin [any person or municipality violating the water diversion act] from continuing such violation" and set forth civil penalties for such violations. General Statutes § 22a-376. The legislature also empowered the department, after a permit has been issued, to "periodically investigate and review those diversions which are taking place pursuant to a permit issued in accordance with [the water diversion act]. If he determines that there is any violation of the terms, limitations or conditions of the permit, he may suspend or revoke said permit in accordance with the provisions of Chapter 54 or may request the Attorney General to bring an action to enjoin such violation in accordance with the provisions of subsection (a) of section 22a-376." General Statutes § 22a-375 (a); see Regs., Conn. State Agencies § 22a-377 (c)-1 (b) and (c) (prohibiting holders of permitted or registered diversions from increasing amount of water to be diverted). In addition, § 22a-376 (c) of the water diversion act expressly makes an applicant subject to the criminal penalties of §§ 53a-155 to 53a-157b, inclusive, if the applicant "knowingly makes any false statement, representation or certification in any application, record, report, plan, or other document filed or required to be maintained . . . or who falsifies, tampers with or knowingly renders inaccurate any monitoring or method required to be maintained . . . ."

Having set forth the parameters of the water diversion act as it bears on the issues before us, we now address the question of whether the department exceeded its authority in requesting information about the plaintiff's excavation activities in the October 21, 2008 letter.

The commissioner first claims that the broad definitions of "diversion," "waters," and "instantaneous flow" in § 22a-367 empower the department to look beyond the diversion identified by the applicant in its permit application and examine, by way of §§ 22a-369 and 22a-373, *all* aspects of the plaintiff's activities that *may* constitute diversions, which may include the plaintiff's excavation activities. We conclude that, even if we assume, without deciding, that the plaintiff's excavation activities could constitute a diversion that is not exempted from the permitting requirements; see foot-

note 21 of this opinion; the water diversion act generally does not empower the department to request information to determine the extent and environmental effects of diversions other than those for which a permit is sought.

Although the water diversion act defines a "[d]iversion" as "*any* activity which causes, allows or results in the withdrawal from or the alteration, modification or diminution of the instantaneous flow of the waters of the state"; (emphasis added) General Statutes § 22a-367 (2); §§ 22a-369 and 22a-373 of the water diversion act do not empower the department to request information about "*any* diversion" or "*all potential* diversions." Rather, the water diversion act empowers the department to request and consider information about "*the* diversion," "*the* diverted water," "withdrawals and discharges of water *the applicant proposes to divert*," "*the* diversion permit"; (emphasis added) General Statutes § 22a-369; and "*the proposed* diversion."[29] (Emphasis added.) General Statutes § 22a-373. In other words, §§ 22a-369 and 22a-373 authorize the department to request information from an applicant about *the specific, proposed activity* which causes, allows, or results in the withdrawal from or the alteration, modification or diminution of the instantaneous flow of the waters of the state *for which the applicant has sought a permit.*[30]

To construe the water diversion act, as the commissioner has, to allow the department to request information about *additional* diversion activities for which the plaintiff has *not* sought permits would fail to give effect to the limiting language—"*the* diversion" and "of *the proposed* diversion"—the legislature specifically chose in §§ 22a-369 and 22a-373. See *Buttermilk Farms, LLC* v. *Planning & Zoning Commission*, 292 Conn. 317, 330–31, 973 A.3d 64 (2009) (concluding that limiting language—"the land to be subdivided"—prohibited zoning commission from denying developer's subdivision application for failure to include off-site sidewalks because to conclude otherwise "would, in effect, have to read the limiting language of that provision out of the statute . . . [and would extend power to the commission] by construction beyond the fair import of the language of the enabling statute or to include by implication that which is not clearly within the express terms of that statute" [citations omitted; internal quotation marks omitted]). It is a "basic tenet of statutory construction that the legislature [does] not intend to enact meaningless provisions. . . . [I]n construing statutes, we presume that there is a purpose behind every sentence, clause, or phrase used in an act and that no part of a statute is superfluous." (Internal quotation marks omitted.) *Felician Sisters of St. Francis of Connecticut, Inc.* v. *Historic District Commission*, 284 Conn. 838, 849–50, 937 A.2d 39 (2008).

That is not to say, however, that the department

would be constrained to accept the applicant's characterization of the diversion solely as it appears in the permit application. The language granting the department authority to request any information about a proposed diversion that he or she deems necessary to fulfill the purposes of the water diversion act; see General Statutes § 22a-369; may reasonably be interpreted to encompass information necessary to determine whether an applicant's characterization of the proposed diversion is accurate and complete. Cf. *Unistar Properties, LLC* v. *Conservation & Inland Wetlands Commission*, supra, 293 Conn. 98–99 (wetlands commission statutorily authorized to seek wildlife inventory to determine impact of plaintiff's activity not required to credit plaintiff's expert testimony as to lack of such impact or to disprove plaintiff's position in order to obtain that inventory).

Suppose, for example, that an applicant sought a permit for only one of several withdrawals of water on the same property, all of the withdrawals' being part of and affecting the same water system. Review of the effects of one withdrawal on this water system might necessitate review of the effects of all withdrawals on the water system insofar as the department might reasonably determine that existence of these similar, yet unpermitted, diversions from the same water system so affected its review of the submitted application such that it could not fairly evaluate the submitted application; the department would likely be entitled to request information to ensure sufficient review of the submitted application. These requests are reasonable interpretations of the language of the water diversion act, which, relating to this example, authorizes the department to request a "description of the existing water system where the diversion is proposed"; General Statutes § 22a-369 (3); and requires the department to consider, before acting on a completed permit application, "[t]he effect of the proposed diversion on existing and planned water uses in the area affected" and "[t]he effect of the proposed diversion on the existing water conditions . . . ." General Statutes § 22a-373 (b) (2) and (5).[31]

The department's authority to request information, pursuant to §§ 22a-369 and 22a-373, about diversion activity other than the diversions for which the plaintiff has sought permits extends only to information necessary for sufficient review of the applications—and diversions—under review. This is the very hydraulic relationship that the plaintiff claims the department should be required to allege or establish before it may request information about additional diversions, if any, on the plaintiff's properties. After all, the mere fact that more than one diversion exists or is being created on the same property does not make all diversions part of the same water system, as in the previous example, or render review of the additional diversions so necessary in terms of evaluating the submitted application by ref-

erence to the relevant factors set forth in the water diversion act such that the department cannot fairly evaluate the submitted application.

In no phase of the proceedings in the present case, however, has the department ever asserted that its authority for requesting information relating to the plaintiff's excavation activities is due to any such inextricable hydraulic connection to the plaintiff's proposed withdrawals, despite the plaintiff's consistent position that any such hydraulic connection was absent. Moreover, the information requested in the October 21, 2008 letter on its face does not appear to be intended to elicit whether such a connection exists. Rather, the information appears to treat the excavation activities as independent diversions, connected to the proposed diversions only by the fact that they facilitate those activities. Such a request goes too far.

Merely because an applicant engages in an activity that gives rise to the need for, or utility of, distinct diversions on the same property does not mean that the water diversion act empowers the department to utilize its authority in the permit review process for one diversion to regulate the other diversion. Put another way, merely because the department has *jurisdiction* over all activities that qualify as diversions pursuant to the water diversion act does not mean that the department properly exercises the *authority* to request information about one diversion during the permit review process of the other diversion as if both were included in the application. See footnote 19 of this opinion. Indeed, if an owner or operator creates a distinct diversion for which a permit is required, but none is sought, the department is not left without recourse; the statutory scheme empowers the department to take enforcement action. See General Statutes § 22a-376.

Thus, in the context of the plaintiff's specific applications to withdraw water from basins and wells, to the extent that the department attempts to regulate the plaintiff's excavation activities as diversions in and of themselves, or determine whether they are diversions, by exercising powers granted to it to review an application for the plaintiff's proposed withdrawals, the department may not rely on §§ 22a-369 and 22a-373 for such authority.

We next turn to the commissioner's alternative basis for its requests for information about the plaintiff's excavation activities in the October 21, 2008 letter, namely, that §§ 22a-369 and 22a-373 provide authority to request information about the plaintiff's excavation activities as an "effect" of the plaintiff's proposed diversions. Specifically, the commissioner claims that, because §§ 22a-369 and 22a-373 authorize the department to request information about the effect of the plaintiff's withdrawals of water, and because the plaintiff would be unable to excavate absent the use of the

diverted water to cool its machines, suppress dust, and wash aggregate, the department may properly request information about the plaintiff's excavation activities as an effect of the proposed diversion. The commissioner further contends that §§ 22a-369 and 22a-373 authorize it to request information about the environmental effects of any activity facilitated or enabled by the withdrawn, diverted water. The plaintiff responds that the department's authority to request information relating to the effect of the proposed withdrawal is limited by the enumerated items in each subsection of the water diversion act addressing the "effect" of the diversion, or matters related thereto that further the purpose of the water diversion act, and that its excavation activities do not fall within those parameters. We agree with the plaintiff.

The "effect of the proposed diversion" is addressed in the statutory scheme in two places. Section 22a-369 (7) of the water diversion act first empowers the department to request information about "[t]he effect of the proposed diversion on public water supplies, water quality, wastewater treatment needs, flood management, water-based recreation, wetland habitats, waste assimilation, agriculture, fish and wildlife and low flow requirements . . . ." Section 22a-373 of the water diversion act then empowers the department to consider, before taking action on a completed application, information about "[t]he effect of the proposed diversion" on enumerated considerations relating to water resources. See General Statutes § 22a-373 (b) (1), (2), (5), (6), and (7) (referencing the "effect" of the proposed diversion).[32] Sections 22a-369 and 22a-373 thus empower the department to request information about the effect of the proposed diversion *on* something, specifically, water resources and other matters related thereto within the scope of the purpose of the water diversion act. Requiring an applicant to submit such information enables the department to determine whether a proposed diversion potentially could have an adverse effect on those water resources or matters related thereto, enumerated or otherwise, within the scope of the purpose of the water diversion act. Indeed, it is evident that the thrust of the water diversion act— the permitting requirements, the reporting requirements, and the penalty provisions—is concerned with changes in the flow of water that affect the quantity and quality of water resources, and the activities and users dependent on those resources. See General Statutes § 22a-366 ("the waters of Connecticut are a precious, finite and invaluable resource upon which there is an ever increasing demand for present, new and competing uses").

Under the facts of the present case, the department's reliance on the authority granted by §§ 22a-369 and 22a-373 to request information about the plaintiff's excavation activities as an "effect of the proposed diversion"

is misplaced for several reasons. First, the plaintiff's excavation activities are not a water resource or a matter related thereto; it is not similar to the enumerated items upon which the effect of the diversion is to be measured. See footnote 32 of this opinion. And even if it were, the department does not seek to determine the effect of the plaintiff's proposed diversions, namely, its withdrawals of water, *on* the plaintiff's excavation activities; instead, the department seeks to determine the effect of the plaintiff's excavation activities on environmental resources.

Second, to the extent the commissioner claims that the plaintiff's excavation activities are, themselves, an "effect" of the withdrawals of water because such activities are facilitated or enabled by such withdrawals, such an interpretation requires this court to consider the excavation activities as requiring the use of and therefore *causing* the proposed withdrawals, *and* yet to consider those same excavation activities as resulting from and being the effect of the proposed withdrawals. Even assuming that this logically inconsistent interpretation of cause and effect were reasonable, the legislature knew how to use language to empower the department to request information about indirect or secondary effects of a regulated activity, as well as effects of additional activities that are facilitated or enabled by a regulated activity. See, e.g., General Statutes § 22a-41 (a) (6) (requiring department, in carrying out Inland Wetlands and Watercourses Act [wetlands act], General Statutes § 22a-36 et seq., to consider "[i]mpacts of the proposed regulated activity on wetlands or watercourses outside the area for which the activity is proposed and *future activities associated with, or reasonably related to, the proposed regulated activity which are made inevitable by the proposed regulated activity and which may have an impact on wetlands or watercourses*" [emphasis added]). If the legislature had intended the water diversion act to confer the authority to consider or regulate activities facilitated or enabled by a proposed diversion whose sole relation to such diversion is the use of the diverted water at any point during the facilitated activity, it certainly could have inserted language to that effect. Compare General Statutes § 22a-41 (a) (6) (addressing under wetlands act "future activities associated with, or reasonably related to, the proposed regulated activity which are made inevitable by the proposed regulated activity"), with General Statutes § 22a-369 (2) (requiring diversion permit application to submit information on "use of diverted water"). To interpret the water diversion act as allowing the department to request information about the effect of the excavation activities on water resources or matters related thereto would effectively result in an end run around the requirement that the department first determine whether the excavation activities are, themselves, diversions for which a permit

is required.[33] In the absence of explicit language to that effect, we will not presume that the legislature intended the water diversion act to confer what would be almost limitless authority. Cf. *AvalonBay Communities, Inc.* v. *Inland Wetlands Commission*, 266 Conn. 150, 165, 832 A.2d 1 (2003) ("[i]f we were to interpret the [inland wetlands and watercourses] act as authorizing the denial of a permit due to development in the upland areas, the only consequence of which as it relates to wetlands is the reduction in a wetland obligate species, the commission's jurisdiction would be limitless").

Third, the department's interpretation of § 22a-369 appears in tension with its own regulation, which *requires* it to evaluate the effect of the proposed diversion under § 22a-369 (7) "using stream flows, where applicable, with [a series of] recurrence intervals . . . ." Regs., Conn. State Agencies § 22a-377 (c)-2 (a) (2). The department does not purport to justify its requests for information about the plaintiff's excavation activities as the means by which it intends to consider stream flows as required by this regulation.[34] Accordingly, we conclude that the water diversion act does not authorize the department's requests for information about the plaintiff's excavation activities and the environmental effects thereof as "effects" of the plaintiff's proposed diversions.

Finally, to the extent that the commissioner relies on the residual grant of authority to request information necessary to fulfill the purposes of the water diversion act; see General Statutes § 22a-369; that grant of authority cannot be read so broadly as to render the specific grants of authority superfluous.[35] Our construction of the water diversion act tethers that authority to the diversion at issue, its effects on water resources, and those dependent on such resources, consistent with the purposes of the water diversion act.

Although we conclude that the excavation activities cannot be regulated as an "effect" of the proposed diversions, we also are compelled to note that we do not endorse the plaintiff's view that the proposed diversion's "area of influence" defines the limits of the department's authority in properly considering the diversion's effects. The term "area of influence" does not appear in the water diversion act or the regulations promulgated thereunder. Rather, it appears in a regulation addressing a different, and very specific, subject matter: mapping wells in stratified drift aquifers. See Regs., Conn. State Agencies § 22a-354b-1 (a) (3).[36] Although there is an isolated reference in a water diversion regulation to that aquifer mapping regulation; see Regs., Conn. State Agencies § 22a-377(c)-2 (a) (1); it is clear that this single reference is not intended to incorporate the area of influence metric into the water diversion act as a universal substantive element. Rather, it is intended to address the limited situation in which

a diversion might impact the boundaries of an area subject to the aquifer mapping requirements. See Regs., Conn. State Agencies § 22a-377(c)-2 (a) (1) ("[i]f the proposed diversion involves a withdrawal of ground water and can reasonably be expected to change the boundaries of an area of contribution or recharge areas of a well field as delineated on a Level A Map approved under [General Statutes §] 22a-354d . . . the applicant shall submit a revised Level A Map prepared in accordance with section 22a-354b-1 of the Regulations of Connecticut State Agencies"). Simply put, there is no basis to apply "area of influence" to diversions generally. Although the plaintiff contends that some physical limitation must restrict the department's authority, whether area of influence or otherwise,[37] we may not engraft a limitation on the department's authority that is not so provided. See *AvalonBay Communities, Inc.* v. *Inland Wetlands Commission*, supra, 266 Conn. 164 ("[a]bsent such language by the legislature [in the present act], this court cannot engraft amendments into the statutory language" [internal quotation marks omitted]).

Although the preceding analysis disposes of the parties' claims, because the trial court and the commissioner relied heavily on this court's decision in *Unistar Properties, LLC* v. *Conservation & Inland Wetlands Commission*, supra, 293 Conn. 93, as supporting the department's authority for its expansive requests for information, we briefly address that decision. The commissioner claims that *Unistar Properties, LLC*, supports the department's authority to request information about the excavation activities as diversions themselves because it need not be bound "merely [by] the particular withdrawal identified by [the plaintiff]" in its applications. The commissioner also claims that *Unistar Properties, LLC*, supports the department's expansive requests about the excavation activities as the "effect of the proposed diversion" because only it, not the plaintiff, determines what the "effects" of the plaintiff's proposed withdrawals are. We conclude that, although *Unistar Properties, LLC*, supports the general proposition underlying the commissioner's argument, that case is inapposite as applied to the particular information at issue in the present case.

In *Unistar Properties, LLC*, it was undisputed that the agency had statutory authority to request the information required from the applicant. The question at issue in that case was whether the applicant's submission of expert testimony as to the ultimate question for which the information had been sought could *divest* the agency of authority to demand the information or could shift the burden to the agency to prove why the information nonetheless was necessary. Id., 106–107, 111–13.[38] By contrast, for the reasons previously set forth in this opinion, in the present case, there is no express or implied grant of authority for the department

to request the extent of information at issue. Indeed, the plaintiff does not claim that its submission of information to the department satisfies some other statutory requirement that could *divest* the department of authority it already has, but rather claims that the department lacks the authority to request the information in the first instance.

Nevertheless, *Unistar Properties, LLC*, does support the commissioner in one limited respect, to which we already have alluded. In that case, we concluded that the department had the right to make its own independent assessment as to the effect of the applicant's proposed actions, irrespective of the opinion of the applicant's expert that the actions would not give rise to the harm at issue. Id., 112. In the present case, as we previously have indicated, the department is not required to accept the plaintiff's application as conclusively complete and accurate. Thus, insofar as the water diversion act requires the department to consider the ultimate question of what effect the proposed diversion has on water resources and other matters related thereto, the department need not accept the plaintiff's assertions that any "effect of the diversion" on water resources is limited to the area of influence and that it need not provide information beyond that limit. If the department is of the view that information beyond that limit is necessary to determine what effect the proposed diversion has on water resources, the department has authority to request information about water resources beyond such area. In light of the expansive requests that were made in the present case, however, we caution that, whatever metric is proper for determining how much information the department may request, there are limits to the department's reasonable exercise of such authority to demand information of an applicant. See id., 111 n.15 ("[w]ith respect to requests for inventories of plant and animal species *outside* a regulated area, there may be a situation in which the distance between the regulated area and the areas on the property for which an inventory is requested is so remote and makes it so unlikely that the activity could have any effect on the wetlands that it would be arbitrary and capricious for the commission to impose such a demand on an applicant" [emphasis in original]).[39]

Finally, in light of the procedural posture of the present case, we clarify what our decision does not do. This decision does not, nor could it, determine whether the information submitted by the plaintiff in support of its applications—both its initial submissions and its supplemental submissions—is sufficient, or whether the plaintiff will ultimately be entitled to the water diversion permits. This appeal is neither an appeal from the denial of an application for a permit because it was deemed incomplete by the department; see, e.g., id., 93; nor an appeal from the denial of an application on its merit. See, e.g., *AvalonBay Communities, Inc.* v.

*Inland Wetlands Commission,* supra, 266 Conn. 150. Nothing in this decision should be considered to decide whether the department, in implementing the water diversion act in other factual scenarios, may regulate excavation activities as a "diversion," whether any exemptions apply to these activities; see footnote 21 of this opinion; or whether other agencies' jurisdiction over these activities is concurrent or overlapping. See *Sams* v. *Dept. of Environmental Protection,* supra, 308 Conn. 391–96; see also footnote 40 of this opinion. In addition, this appeal does not involve any determination of whether the department may institute enforcement actions against the plaintiff to enjoin those diversions, if any, for which the plaintiff has not sought permits. Instead, our decision delineates the scope of the department's authority to request information from the plaintiff for the specific diversions under review in these specific permit applications. Only after the permit review process will a record be available for suitable review of any other issues left unresolved by this appeal.

We therefore conclude that, in the context of the plaintiff's applications for diversion permits for withdrawals of water, the department's attempts to regulate the plaintiff's excavation activities as diversions separate and apart from the withdrawals for which the plaintiff seeks permits or as an "effect" of the proposed diversions are not authorized by the water diversion act.

V

AUTHORITY TO REQUEST WETLANDS
MITIGATION PLAN

The plaintiff next claims that, with respect to its North Branford facility, the trial court improperly construed the water diversion act as allowing the department to effectively reopen municipal wetlands permits that had been issued by the North Branford wetlands agency in 1974 and 1984, and to a demand wetlands mitigation plan for excavation activities previously authorized by those permits. The commissioner responds that this court should affirm the judgment of the trial court, which determined that the department exercises overlapping jurisdiction with the North Branford wetlands agency and that, absent a specific exemption in the water diversion act, the department may properly regulate the impacts of diversion activities on wetlands. We conclude that the water diversion act does not authorize the department's request for a mitigation plan from the plaintiff in the present case.

The record reveals the following additional facts. In 1974 and 1984, the plaintiff received permits from the North Branford wetlands agency that authorized the plaintiff to "remove [nineteen] areas of inland wetlands" on its North Branford property. Although the record does not indicate the full extent to which the plaintiff actually removed the indicated wetlands, the depart-

ment's October 21, 2008 letter indicated that at least twelve acres of inland wetlands had been removed or affected. Similarly, although the record does not indicate the plaintiff's current use of the areas at issue, the plaintiff made an unchallenged representation in its brief to this court that "the authorized work has long since been carried out . . . ." In its October 21, 2008 letter, the department requested the following information specific to the plaintiff's North Branford facility that it deemed "necessary to complete the application": "[a] wetland[s] mitigation plan to off-set the approximately [twelve] acres of inland wetlands that have been destroyed by the post-1990 expansion of the quarry . . . ." In its declaratory action, the plaintiff asked: "[w]hen an applicant for a water diversion permit already has obtained a local wetlands permit for activities that are located on the diversion site but are hydraulically unrelated to the diversion, may the [department], processing a diversion permit application, demand information regarding such wetlands and regulated activities and regulate those activities again?"

In the declaratory ruling, the commissioner ruled that, notwithstanding the North Branford wetlands agency's jurisdiction over the wetlands on the plaintiff's property, the water diversion act independently authorizes the department's request for information about the wetlands and that, as such, the department can properly request "information on inland wetlands and watercourses and will likely include information typically provided to a local wetlands commission." The commissioner also ruled that the water diversion act authorizes the department to regulate wetlands activities "because the impacts [of the activities regulated by the water diversion act] may differ from impacts to wetlands from activities regulated by the [wetlands act]" and because the legislature failed to exempt from the water diversion act activities already permitted by local wetlands commissions. The trial court agreed.

On appeal, the plaintiff claims that the department's request for a wetlands mitigation plan constitutes a "reopening" of the plaintiff's municipal wetlands permits and, in essence, regulation of the activities previously authorized by such municipal wetlands permits. The plaintiff claims that allowing the department to reopen its long-expired municipal wetlands permits contravenes the legislature's "division of responsibility" over wetlands and incorrectly assumes that overlapping subject matter of the wetlands act and the water diversion act automatically creates concurrent permitting jurisdiction over wetlands. In response, the commissioner claims that its request for a wetlands mitigation plan was independently authorized by the water diversion act notwithstanding any overlapping jurisdiction.

Because the plaintiff makes the same reference to hydraulic relationship in its petition question; see part

IV A of this opinion; we again reframe the question presented to become "whether the water diversion act authorizes the department's request for the wetlands mitigation plan in its October 21, 2008 letter," and answer that question in the negative. We conclude that, although the water diversion act authorizes the department to request information about the wetlands on the North Branford property, the department exceeded such authority in requesting the wetlands mitigation plan of the October 21, 2008 letter.

We begin with the statutory language. The water diversion act authorizes the department to request and consider information relating to wetlands resources. Specifically, § 22a-369 (7) requires the applicant to submit information about "effect of the proposed diversion on . . . wetlands habitats" and § 22a-373 (b) (2) requires the department to consider, before acting on a completed permit application, the "effect of the proposed diversion on existing and planned water uses in the area affected such as . . . wetland habitats . . . ." The commissioner points to these provisions as authorizing the department to request information about the altered wetlands in order to broadly perform an "[e]valuation of effects upon wetlands" and "wetlands resources."

Our resolution of the first question of the plaintiff's petition in part IV B of this opinion largely resolves this issue, however. The department has *not* invoked these provisions in order to determine the effect of the plaintiff's proposed diversions—the plaintiff's withdrawals of water—on wetlands habitats; it has invoked them, instead, to determine *and mitigate* the effect of the plaintiff's prior *excavation activities* on wetlands habitats. Indeed, the October 21, 2008 letter phrases the scope of the request in terms of "post-1990 expansion of the quarry," not in terms of whether the plaintiff's withdrawals of water affect (or affected) wetlands resources other than in their role as enabling the plaintiff to excavate. As discussed in part IV B of this opinion, *in the context of the permit review process for the plaintiff's proposed withdrawals of water*, the department's attempt to regulate the plaintiff's excavation activities, either as an "effect of the proposed diversion" or as a diversion in and of itself, by requesting information about the effect of excavation activities on wetlands exceeds the authority granted by §§ 22a-369 and 22a-373 and constitutes a regulatory end run around the requirement that the department determine, in the first instance, that the plaintiff's excavation activities constitute diversions.

The commissioner additionally claims, however, that *the alteration of wetlands* is a diversion in and of itself and, therefore, that the water diversion act grants the department independent authority to request information about the effect of these wetlands alterations on

wetlands resources. As discussed in part IV B of this opinion, however, *in the context of the permit review process for the plaintiff's proposed withdrawals of water*, the authority to request information about diversion activities *other than* the plaintiff's proposed withdrawals of water is generally limited to requesting information from the plaintiff that is necessary for review of the application submitted, such as requesting information properly within the scope of authority granted by §§ 22a-369 and 22a-373 to determine whether the plaintiff's characterization of the diversions in the application is accurate and complete. The department does not contend that the plaintiff's prior wetlands alterations constituted a diversion implicating and affecting the same water system as the plaintiff's withdrawals such that the department cannot fairly evaluate the submitted withdrawal applications without review of these alterations. See footnote 31 of this opinion. Nor does the department claim entitlement to this mitigation plan to *determine whether* the prior wetlands alterations will, or did, affect the same water system as the withdrawals. Indeed, unlike with respect to the first question in the declaratory ruling, the department has never challenged the plaintiff's characterization of the wetlands at issue as "hydraulically unrelated" to the diversions for which the plaintiff sought in the North Branford permit. The declaratory ruling itself makes no attempt to link the wetlands to the requested withdrawals, but rather, to the excavation activities. Thus, it is clear that there is no authority to use the permit process for the proposed diversions to regulate the wetlands. We therefore conclude that, in the context of the permit review process for the plaintiff's proposed withdrawals, the department has exceeded its authority in requesting a wetlands mitigation plan such as the one requested by the department in its October 21, 2008 letter and we therefore answer the reframed question in the negative.[40]

## VI

### DELAY IN PROCESSING NPDES PERMIT APPLICATION

Finally, the plaintiff claims that, with respect to its North Branford facility, the trial court improperly affirmed the commissioner's conclusion that the department had the authority to delay processing the plaintiff's NPDES permit application required under the clean water act until it provided the department with the information requested in connection with its diversion permit application required under the water diversion act. We agree with the plaintiff that the regulation upon which the department relies for this authority does not allow it to delay processing the plaintiff's NPDES permit application.

As discussed previously in this opinion, the plaintiff's North Branford facility requires the removal of a sub-

stantial amount of stormwater from a quarry. The plaintiff applied for a diversion permit for the withdrawal of 2,000,000 gallons of water per day of stormwater from the quarry and seeks an NPDES permit that will allow it to discharge the 2,000,000 gallons of water per day into an unnamed tributary to Cedar Pond. The department administers both discharge and diversion permits, the former pursuant to chapter 446i of the General Statutes, which governs water resources, and the latter pursuant to chapter 446k, which governs water pollution control.[41] The plaintiff's current, though lapsed, NPDES permit authorizes a monthly *average* discharge of 400,000 gallons of water per day into that pond, with a daily maximum discharge of 2,000,000 gallons per day; the plaintiff therefore seeks to renew and modify its existing NPDES permit to match the amount it wishes to divert.

At some point during the permit review processes for both the NPDES permit application and the water diversion permit application, the department "became concerned about a possible downstream flooding hazard and the possibility of adverse water quality impacts to the receiving surface waters resulting from erosion and sedimentation . . . [and] communicated these concerns to representatives for [the plaintiff] . . . ." The department concluded that, because "the activity addressed in the diversion permit application is directly associated with activity addressed in the request to modify the NPDES discharge permit" pursuant to § 22a-430-4 (d) (3) of the Regulations of the Connecticut State Agencies, the department would not act "on the portion of [the plaintiff's NPDES permit] application in which it requests an increase in its discharge flow until [the plaintiff] has addressed the outstanding issues associated with the diversion permit application."

The third question of the plaintiff's petition for a declaratory ruling asked whether "the [department may] decline to process or delay processing an NPDES permit renewal on the ground that the applicant has not supplied to the [department] requested additional information regarding a pending water diversion permit application." The commissioner ruled that the department could properly delay processing the plaintiff's NPDES permit application because § 22a-430-4 (d) (3) of the Regulations of Connecticut State Agencies authorized the department to delay processing a completed NPDES permit application when a "related" permit application is incomplete or may be denied. The trial court affirmed the commissioner's ruling and agreed that the two permit applications were related because, "[a]lthough the NPDES permit would authorize the *discharge* of quarry water to wetlands and watercourses downstream, the *diversion* of this water must be authorized by a diversion permit." (Emphasis in original.)

Our resolution of this issue requires us to interpret § 22a-430-4 (d) (3) of the Regulations of Connecticut State Agencies, the sole regulation upon which the department relies for the authority to delay processing the plaintiff's NPDES permit application. See *Vitti* v. *Allstate Ins. Co.*, 245 Conn. 169, 178, 713 A.2d 1269 (1998) ("[o]ur rules of statutory construction apply to administrative regulations" [internal quotation marks omitted]).[42] We begin with the pertinent regulatory language. Section 22a-430-4 generally sets forth the procedures and criteria for issuing water discharge permits. Section 22a-430-4 (c) sets forth the requirements for those discharge permit applications. Section 22a-430-4 (c) (18) specifically requires NPDES permit applications to include a listing of all permits approvals received or applied for under various state and federal programs. Section 22a-430-4 (d) addresses preliminary review of the discharge permit applications. Section 22a-430-4 (d) (3) specifically provides: "The completeness of an application shall be judged independently of the status of any other permit application or permit for the same facility or activity. The department may delay processing a completed application if it is associated with another application which is incomplete or which may be denied."

Although the parties focus their discussion on whether the plaintiff's NPDES permit application is "associated with" its water diversion permit application, in our view, the scope of the department's authority under this regulation is principally dictated by the regulatory definition of "application," which is expressly incorporated into § 22a-430-4 (d) (3) of the Regulations of Connecticut State Agencies. See Regs., Conn. State Agencies § 22a-430-3 (a) (1).[43] Section 22a-430-6 (b) (1) of the Regulations of Connecticut State Agencies defines an "[a]pplication" as "completed forms prescribed by the [c]ommissioner for applying for issuance, reissuance, modification or transfer of an individual permit under [General Statutes §] 22a-430 . . . or registering for a general permit under [General Statutes §] 22a-430b . . . including any additions, revisions, or modifications thereto." General Statutes §§ 22a-430 and 22a-430b, which fall within the chapter of the General Statutes pertaining to water pollution control, govern permits for the discharge of water, substance, or materials into the waters of the state, including NDPES permits required under the clean water act. Therefore, the regulatory definition of "application" is limited to applications for discharge permits governed by General Statues §§ 22a-430 and 22a-430b and implicitly excludes applications for permits issued pursuant to other environmental programs, such as applications for permits issued pursuant to the water diversion act. Accordingly, unless other language in § 22a-430-4 (d) (3) of the Regulations of Connecticut State Agencies indicates that "application" must be construed differ-

ently than as it is defined in § 22a-430-6 (b) (1) of the Regulations of Connecticut State Agencies, we must construe that term as meaning an application for a discharge permit. Absent a broader construction, the department clearly would lack authority to delay processing a completed discharge permit application due to the status of a nondischarge permit application such as the diversion permit application at issue in the present case.

The parties agree that the references in the first sentence of § 22a-430-4 (d) (3) of the Regulations of Connecticut State Agencies to the "completeness of an application" and in the second sentence to delaying the processing of "a completed application" both refer to a discharge permit application—in the present case, the NPDES permit application. Our inquiry therefore centers on the mandate that the department judge the completeness of that discharge permit application "independently of the status of *any other permit application or permit for the same facility or activity*" and the authority vested in the department to delay processing a completed discharge application "if it is associated with *another application* which is incomplete or which may be denied." (Emphasis added.) Regs., Conn. State Agencies § 22a-430-4 (d) (3). In our view, it is significant that the regulation distinguishes between "any other permit application or permit for the same facility or activity" and "another application." As to the former, the phrase "any other permit application" could be construed broadly to mean more than simply a discharge permit application because limiting it as such would render superfluous the word "permit," as the definition of application already means a permit application. Instead, "any other permit application" reasonably could be construed to encompass *any type* of permit application, whether an application for a discharge permit or other permit such as a water diversion permit, for the same facility or activity. In the particular context of NPDES applications, this construction seems logical given the requirement that the applicant list various other permits for which it has applied or received approval. Thus, the first sentence would preclude the department from judging the completeness of the NPDES permit application based on the status of the plaintiff's water diversion permit application for the North Branford facility.[44]

By contrast to the phrase "any other permit application" in the first sentence of § 22a-430-4 (d) (3) of the Regulations of Connecticut State Agencies, the second sentence empowers the department to delay processing a completed discharge application if it is associated with "another application" that is incomplete or that may be denied. We presume that the use of different modifiers of "application" was intended to import a different meaning. See *C. R. Klewin Northeast, LLC* v. *State*, 299 Conn. 167, 177, 9 A.3d 326 (2010) ("[t]he use

of the different terms . . . within the same statute suggests that the legislature acted with complete awareness of their different meanings . . . and that it intended the terms to have different meanings" [internal quotation marks omitted]); *Moon* v. *Zoning Board of Appeals*, 291 Conn. 16, 22, 966 A.2d 722 (2009) (applying same rule of construction to regulations). A common dictionary definition of "another" is "an additional one of the same kind; one more"; Webster's Third New International Dictionary (2002); which does not indicate a different type or category of application, but rather more of the *same* type or category. See *Vitti* v. *Allstate Ins. Co.*, supra, 245 Conn. 178 ("[i]n the absence of other statutory [or regulatory] guidance, we may appropriately look to the meaning of the word[s] as commonly expressed in the law and in dictionaries"). Thus, by modifying "application" with the word "another," the department did not signal a clear intent to depart from the regulatory definition of "application," which refers only to discharge permit applications. If the department had wished to depart from the regulatory definition of "application" in the second sentence of § 22a-430-4 (d) (3), it could have employed the same explicit language it had used in the first sentence. See Regs., Conn. State Agencies § 22a-430-4 (d) (3) ("*any other permit application* or permit for the same facility or activity" [emphasis added]). Accordingly, the reference to "another application" in the second sentence of § 22a-430-4 (d) (3) refers to an additional discharge permit application. As such, the department could delay processing the plaintiff's NPDES permit application if there were another *discharge* permit application pending before it that was associated with the NPDES permit application. The department could not, however, delay that permit approval due to the plaintiff's pending water diversion permit application.

Our interpretation of § 22a-430-4 (d) (3) of the Regulations of Connecticut State Agencies makes logical sense when viewing the regulatory scheme in its entirety. It seems reasonable that, for example, multiple discharges into the same water system by the same applicant could be associated with each other. Construing the regulation as empowering the department to delay processing a completed discharge permit application that is "associated with" another discharge permit application prevents an applicant with multiple pending discharge permit applications from being able to compel the department to make piecemeal decisions on facets of the applicant's overall discharge activity over which the department properly has the same or similar water pollution concerns. Allowing the department to delay processing a completed discharge permit application if it is associated with a different *type* of permit application, such as a water diversion permit application, however, would risk arbitrary enforcement and allow the department to hold up a properly complete and perhaps

meritorious discharge permit application merely because a different permit application, administered pursuant to an entirely different environmental program and implicating an entirely different set of environmental concerns, is incomplete or may be denied. While we acknowledge that there is a logical relationship between the diversion and the subsequent discharge of the same water and that such a relationship *could* justify a regulatory scheme under which the department could consider permit applications for these actions concurrently, the regulatory scheme as it currently exists does not allow the department to do so.

We also note that the department's concerns about the plaintiff's water diversion activities appear to be more properly addressed by use of the powers conferred to it by the water diversion act, not the regulations implementing the clean water act. Discharges authorized pursuant to § 22a-430 are exempted from the requirements of the water diversion act. See General Statutes § 22a-377 (a) (3). To construe § 22a-430-4 (d) (3) of the Regulations of Connecticut State Agencies as the commissioner has in the present case would yield a construction that is in tension with this exemption because it would allow the department to accomplish indirectly—regulation of the environmental effects of NPDES discharges pursuant to the water diversion act—what it could not accomplish directly. See footnote 24 of this opinion.

Because the department does not claim authority to delay processing the plaintiff's NPDES permit application under any source other than § 22a-430-4 (d) (3) of the Regulations of Connecticut State Agencies, and because "an administrative body must act strictly within its statutory authority" and "cannot modify, abridge or otherwise change the statutory provisions . . . under which it acquires authority unless the statutes expressly grant it that power"; (internal quotation marks omitted) *Celentano* v. *Rocque*, supra, 282 Conn. 654; we conclude that § 22a-430-4 (d) (3) does not empower the department to delay processing the plaintiff's NPDES permit application due to outstanding matters related to the plaintiff's diversion permit application for the North Branford site.

The judgment is reversed and the case is remanded with direction to sustain the plaintiff's appeal. The commissioner's cross appeal is dismissed as moot.

In this opinion the other justices concurred.

[1] We note that, subsequent to the events underlying the present appeal, the department merged into a new agency, the Department of Energy and Environmental Protection. See Public Acts 2011, No. 11-80, §§ 1, 55.

[2] We note that several provisions of the water diversion act, namely, General Statutes §§ 22a-366, 22a-367, 22a-368a, 22a-373 and 22a-377, have been amended by our legislature since the events underlying the present appeal. See Public Acts 2003, No. 03-141, § 1; Public Acts 2004, No. 04-185, § 2; Public Acts 2005, No. 05-205, § 15; Public Acts 2010, No. 10-32, § 88; Public Acts 2011, No. 11-80, § 1. These various amendments have no bearing on the merits of the present appeal. Consequently, for the sake of simplicity,

we refer to the current revision of these statutes.

[3] As we explain subsequently in this opinion, the trial court remanded the case to the commissioner for further factual findings on one of the questions raised in the petition for a declaratory ruling and dismissed the plaintiff's appeal as to the other two questions. The plaintiff appealed from the judgment of the trial court to the Appellate Court. The commissioner then filed a cross appeal regarding the trial court's authority to issue the remand order. We transferred the appeal and cross appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1. Because we reverse the judgment of the trial court and remand the case with direction to sustain the plaintiff's appeal as to all three questions, we decline to address the propriety of the trial court's remand order and dismiss the commissioner's cross appeal as moot.

[4] See footnote 2 of this opinion.

[5] See footnote 2 of this opinion.

[6] See footnotes 2 and 24 of this opinion.

[7] See footnote 27 of this opinion.

[8] See footnotes 2 and 28 of this opinion.

[9] See footnote 2 of this opinion.

[10] The plaintiff also submitted technical documentation including the rate, amount, and frequency of the proposed withdrawal of water throughout the length of the permit sought; a description of the need for the diversion; a statement regarding the necessity for wildlife and fish habitat mitigation; a hydrogeologic report that describes the surrounding water supply system, any aquifer systems, sensitive resources in the area, calculations of consumptive use of the water, and area of influence calculations; topographic maps with the regulated activity or project site outlined or pinpointed, as appropriate, as well as any designated wetlands on site; an environmental report that describes existing ecological conditions at the site adjacent to the water withdrawals, as well as the wildlife habitat characteristics of those areas, any existing upland and wetland ecology, and the short- and long-term effects of the proposed withdrawals on any wetlands or uplands; an assessment of alternatives to the withdrawal; a long range water conservation plan; plans and drawings; and other site-specific items.

[11] As we explain subsequently in this opinion, "area of influence" is not a term used in the water diversion act, but rather is a term of art defined in a regulation promulgated pursuant to General Statutes § 22a-354b, Connecticut's aquifer mapping statute. See footnote 12 of this opinion.

[12] The plaintiff claimed that "the physical water diversion and its area of influence constitutes a much smaller percentage of the overall property" than what the department claimed, disagreeing with the department's request for information "regarding the entire property on which [the plaintiff] conducts any extraction that includes a regulated diversion . . . ." (Emphasis omitted.) Section 22a-354b-1 (a) (3) of the Regulations of Connecticut State Agencies implements Connecticut's aquifer mapping statute, General Statutes § 22a-354b, and defines "[a]rea of influence" as "the land area that directly overlies and has the same horizontal extent as the part of the water table or other potentiometric surface that is perceptibly lowered by the withdrawal of water. The area of influence delineated by the use of modeling shall be that area of land in which the water table or potentiometric surface is lowered by at least 0.5 feet."

The plaintiff asserted that, under a proper interpretation of the department's authority, in which the "effect of the proposed diversion" would be limited to the "area of influence" of each withdrawal; see footnote 11 of this opinion; it would need to provide comprehensive environmental information for only 61.53 acres, with all but one diversion's area of influence limited solely to the area of the basin itself. Under the department's interpretation, in which the "effect of the proposed diversion" would extend to the proposed limits of the plaintiff's excavation activities for the next twenty-five years, the plaintiff would need to provide such information for, in essence, the entire extent of its properties, which constitutes over 1900 acres.

[13] See, e.g., General Statutes §§ 22a-38 (13) and 22a-40 (a) (1) (defining "[r]egulated activity" in inland wetlands statute to include excavation); General Statutes § 7-148 (c) (8) (C) (relegating authority to regulate excavation to municipalities); General Statutes § 8-12 (authorizing zoning enforcement for zoning violations relating to grading of land).

[14] This information included: another hydrogeologic and hydrologic impacts analysis; an inventory of potentially impacted resources in the areas defined by the impacts analysis; a description of water quality, wastewater treatment needs/waste assimilation, flood management, water based recre-

ation, wetland and wildlife habitat, and short-term and long-term cumulative impacts, buffer areas, a natural diversity database review, and low flow requirements; and a description of the plaintiff's development plans and associated controls, even though "the end use of the property is unknown."

[15] Specifically, the department requested submission of revised site plans for all five of the plaintiff's sites that incorporated: "[t]he delineated boundaries of inland wetlands and watercourses for the existing limits of the processing and excavation areas and any areas proposed to be disturbed for the duration of the permit"; "[t]he location of the [Federal Emergency Management Agency] floodplain and floodway and the elevation contour of the base flood based on the information provided by the National Flood Insurance Program"; "[e]xisting topography within the current limits of the processing and excavation areas and proposed topography for any areas of expansion for the duration of the permit"; "[t]he location and extent of buffer areas provided to protect inland wetlands and watercourses" with a recommended minimum wetland buffer of 100 feet; "[a]n erosion and sedimentation control plan . . . for the existing disturbed areas and any areas proposed to be disturbed for the duration of the permit"; and "[a]dequate stormwater control measures . . . for the existing disturbed areas and any areas proposed to be disturbed for the duration of the permit."

The department further requested "hydraulic and hydrologic" reports for all five sites demonstrating that: "the hydraulic aspects of the project sites have been properly designed within accepted criteria, provided for in the statutes, regulations, and engineering practice"; "the project sites, specifically the North Branford and Wallingford quarries, do not impede or modify drainage patterns, flood flows, flood storage, or low flows in such a way as to cause adverse impacts to other properties or to the environment"; and "the project sites are constructed in such a way as to protect other properties and the environment from adverse pollution impacts."

Additionally, the department noted that if expansion of the plaintiff's processing and excavation areas proposed for the duration of the permits would encroach into the delineated inland wetlands and watercourses, the plaintiff would be required to submit: "[a]quatic and vegetation habitat surveys and assessments of the inland wetlands and watercourses to be impacted"; "[a] functions and values assessment of the inland wetlands and watercourses to be impacted"; "[a]n assessment of the impacts to the functions and values of the affected inland wetland and watercourses"; and "[a]n inland wetland[s] and watercourses mitigation plan which proposes measures to [offset] assessed impacts."

[16] Specifically, the department requested "[a] channel and crossing improvements plan, which provides for safe conveyance of the proposed [two million gallons per day] quarry discharge and a [twenty-five] year storm flow from the quarry outlet downstream to Cedar Lake"; and "[a] plan to treat the quarry discharge to be consistent with the [Environmental Protection Agency] approved [total maximum daily load] for Cedar and Linsley Ponds, which limits the quarry discharge to a phosphorus load of 28 [kilograms per year] or 2.33 [kilograms per month]."

[17] While the plaintiff's NPDES renewal application has been pending, the parties have maintained the status quo and the plaintiff has continued its discharge of quarry water pursuant to the terms of the original NPDES permit.

[18] For reasons not relevant to this appeal, the plaintiff subsequently withdrew its petition and, thereafter, filed a revised petition that was substantially unchanged from the original petition. This procedural distinction does not alter our analysis. In the interest of simplicity, all references in this opinion to the plaintiff's petition will be to the revised petition dated September 2, 2009.

[19] The parties appear to use the terms "jurisdiction" and "authority" somewhat interchangeably. This court has recently attempted to clarify these distinct, though related, concepts in *In re Jose B.*, 303 Conn. 569, 573–80, 34 A.3d 975 (2012). Nevertheless, we will adhere to the parties' use of the terms when describing their claims, though we will attempt to maintain the clarity of these distinct concepts in our reasoning. We note, however, that the issues raised in the first two questions presented by the present case are more properly characterized as questions as to whether the commissioner exceeded her authority in requesting information, not whether the commissioner has jurisdiction over activities that properly fall within the definition of a diversion.

[20] The trial court's remand appears to have been prompted by the commissioner's discussion about reframing the first petition question in that the

question "lack[ed] sufficient context to provide an answer applicable to the [plaintiff's] factual situation . . . ."

[21] In connection with its remand, the trial court noted: "If the plaintiff concludes that the diversion sites, as designated, exceed the commissioner's authority, it may return to the court for further argument." That comment may have been directed to the plaintiff's argument that the excavations were not subject to the permitting requirements because they fell under a statutory exemption, an argument that the trial court declined to address in the administrative appeal because the plaintiff's petition had not asked about the applicability of any exemption.

[22] The record contains only one final decision involving a water diversion permit, although the affidavit attaching the final decision explains its inclusion only in that the department applied the state's Endangered Species Act, General Statutes § 26-310 et seq., to state agencies issuing any permit. This final decision does not demonstrate the department's consistent interpretation of the water diversion act to request information in a manner similar to its October 21, 2008 letter; instead, it discusses myriad issues pertaining to four different permits and, at best, demonstrates the department's interpretation of General Statutes § 26-310 (d), which is not at issue in the present case.

The record also contains an internal memorandum from the director of the department's inland water resources division in 1993 to the department's office of adjudications regarding the department's authority to consider, pursuant to the water diversion act, indirect or secondary impacts to wetlands of a proposed activity. The memorandum states: "In order to meet the broad-based mandate put forth in the legislative findings section of the [water diversion act, § 22a-366], the department necessarily must consider direct, secondary, cumulative and indirect effects of the activities which it is considering authorizing . . . includ[ing] both the effects resulting from the excavation and filling of wetlands required to accomplish the relocation of the subject watercourse [in a particular application] and from the filling of wetlands for the [proposed] construction . . . ." Although the memorandum generally supports the department's contention that it has requested a broad array of information in considering a diversion permit application, the memorandum is an internal document that does not amount to a *formal* articulation of the department's interpretation of the water diversion act. See *Sarrazin* v. *Coastal, Inc.*, supra, 311 Conn. 611 n.20.

[23] The plaintiff has never contended that the case should be remanded to the commissioner because the commissioner failed to rule on the question presented. Indeed, even the plaintiff reframed the first question in its brief to this court: "[t]he primary issue in this case, clearly presented in [the plaintiff's] site-specific and factually detailed 2009 petition, is whether [the department's] October 2008 demand was authorized by the [water] [d]iversion [a]ct in light of: (1) the specific facts of [the plaintiff's] facilities, operations, and water use; (2) which water uses at [the plaintiff's] facilities require a diversion permit, and which are exempt under the [water diversion] [a]ct or its regulations; and—not to be overlooked—(3) the information that [the plaintiff] had already submitted to [the department] about its water use and diversions prior to the agency's 2008 demand." (Emphasis omitted.)

We note that a declaratory judgment action must not be used as a "convenient route for procuring an advisory opinion on moot or abstract questions . . . ." (Internal quotation marks omitted.) *Milford Power Co., LLC* v. *Alstom Power, Inc.*, 263 Conn. 616, 625, 822 A.2d 196 (2003).

[24] Those exemptions include, but are not limited to, "the maximum withdrawal of [50,000] gallons of surface water during any twenty-four-hour period . . . discharges [of water] permitted under the provisions of [Connecticut's implementation of the clean water act, which include discharges pursuant to NPDES permits] . . . a storm drainage system which collects the surface water runoff of an area of less than [100] acres . . . water for fire emergency purposes . . . roadway crossings or culverts which allow for continuous flow or passage of an existing watercourse . . . [and] diversions directly related to routine maintenance and emergency repairs of dams . . . ." General Statutes § 22a-377 (a).

[25] Section 22a-368a (c) requires reporting of current operating data for certain diversions, including "the location, capacity, frequency and rate of withdrawals or discharges [of water] . . . ." The department's website indicates that a standard permit provision for all consumptive diversions—as opposed to nonconsumptive diversions—has been the required filing of annual water diversion reports that state the daily usage of water for each diversion. See Department of Energy and Environmental Protection, "Water

Diversion Reporting," (last modified January 15, 2015), available at http:// www.ct.gov/deep/cwp/view.asp?a=2720&q=325638 (last visited July 8, 2015). General Statutes § 22a-375 (b) required the commissioner to deliver a report to the General Assembly in 2000 that included an inventory of all registered diversions, their withdrawal quantities, and their planned usages.

[26] The commissioner may waive public hearings on an application only if he or she has determined that the specific, proposed diversion: "(1) is necessary, (2) will not significantly affect long-range water resource management or the environment, and (3) will not impair proper management and use of the water resources of the state . . . ." General Statutes § 22a-371 (f).

[27] The applicant must submit information which includes, but is not limited to: "(1) [t]he need for the diversion; (2) [t]he reasons for the diversion and the use of the diverted water; (3) [a] description of the existing water system where the diversion is proposed; (4) [t]he locations of withdrawals and discharges of water the applicant proposes to divert; (5) [t]he quantity, frequency and rate of water the applicant proposes to divert; (6) [t]he length of time for which the diversion permit is sought; (7) [t]he effect of the proposed diversion on public water supplies, water quality, waste-water treatment needs, flood management, water-based recreation, wetland habitats, waste assimilation, agriculture, fish and wildlife and low flow requirements; (8) [t]he alternatives, if any, to the proposed diversion including a study of cost factors, feasibility and environmental effects of such alternatives; (9) [c]onservation measures instituted by the applicant prior to the application and the applicant's long-range water conservation plan to be implemented or continued after the issuance of a permit . . . [that includes] (A) [t]he identification of and cost effectiveness of distribution system rehabilitation to correct sources of lost water; (B) measures which encourage proper maintenance and water conservation; (C) a public information program to promote water conservation, including industrial and commercial recycling and reuse and (D) contingency measures for limiting water use during seasonal or drought shortages . . . ." General Statutes § 22a-369.

[28] The commissioner must consider factors including, but not limited to: "(1) [t]he effect of the proposed diversion on related needs for public water supply including existing and projected uses, safe yield of reservoir systems and reservoir and groundwater development; (2) [t]he effect of the proposed diversion on existing and planned water uses in the area affected such as public water supplies, relative density of private wells, hydropower, flood management, water-based recreation, wetland habitats, waste assimilation and agriculture; (3) [c]ompatibility of the proposed diversion with the policies and programs of the state of Connecticut, as adopted or amended, dealing with long-range planning, management, allocation and use of the water resources of the state . . . (5) [t]he effect of the proposed diversion on the existing water conditions, with due regard to watershed characterization, groundwater availability potential, evapotranspiration conditions and water quality; (6) [t]he effect, including thermal effect, on fish and wildlife as a result of flow reduction, alteration or augmentation caused by the proposed diversion; (7) [t]he effect of the proposed diversion on navigation; (8) [w]hether the water to be diverted is necessary and to the extent that it is, whether such water can be derived from other alternatives including, but not limited to, conservation; [and] (9) [c]onsistency of the proposed diversion with action taken by the Attorney General . . . ." General Statutes § 22a-373 (b).

Section 22a-373 (b) also requires the commissioner to consider limited factors not directly relating to water resources. See General Statutes § 22a-373 (b) (requiring consideration of "[t]he relationship of the proposed diversion to economic development and the creation of jobs" and "[t]he interests of all municipalities which would be affected by the proposed diversion").

[29] The parties do not claim that the prospective nature of the word "proposed" in the water diversion act prevents its application to the plaintiff's *existing* withdrawals of water. This prospective language predated enactment of the amnesty provisions of § 22a-368a that were meant to encourage submission of permit applications for existing diversions. The legislature did not change this prospective language after enactment of § 22a-368a.

[30] That the water diversion act requires an applicant to submit a specified fee depending on the amount and type of use; see General Statutes § 22a-372 (e) (setting forth fee schedule for applications); and, even after a permit has been issued, continues to require differing fees depending on the type of use; see General Statutes § 22a-379 (requiring payment of an annual fee by holders of consumptive diversion permits but not by holders of nonconsumptive diversion permits); supports the conclusion that the water

diversion act does not grant blanket authority to review *any or all* diversion activities during the permit review process for an application for *a specific* diversion activity.

[31] Indeed, the language of the water diversion act may reasonably be interpreted to empower the department to request information about activity not proposed in a submitted application in other situations, such as to determine the accuracy of the applicant's characterization of the diversion as that information would relate to §§ 22a-369 and 22a-373. If, for example, an applicant sought a permit for a consumptive diversion but was inadvertently incorrect about the amount of water the applicant would consume, the department would not be bound by the applicant's determination as to the amount of water the applicant would consume. See General Statutes § 22a-369 (5) ("quantity . . . of water the applicant proposes to divert"). Or, if an applicant sought a permit for a consumptive diversion, but the diversion activity would more properly be characterized as nonconsumptive, the department would not be bound to request information about the proposed diversion as if it conclusively were a consumptive diversion. See General Statutes § 22a-369 (2) ("use of the diverted water").

[32] See General Statutes § 22a-369 (7) ("effect of the proposed diversion *on public water supplies, water quality, waste-water treatment needs, flood management, water-based recreation, wetland habitats, waste assimilation, agriculture, fish and wildlife and low flow requirements*" [emphasis added]); General Statutes § 22a-373 (b) (1) ("effect of the proposed diversion *on related needs for public water supply including existing and projected uses, safe yield of reservoir systems and reservoir and groundwater development*" [emphasis added]); General Statutes § 22a-373 (b) (2) ("effect of the proposed diversion *on existing and planned water uses in the area affected such as public water supplies, relative density of private wells, hydropower, flood management, water-based recreation, wetland habitats, waste assimilation and agriculture*" [emphasis added]); General Statutes § 22a-373 (b) (5) ("effect of the proposed diversion *on the existing water conditions, with due regard to watershed characterization, groundwater availability potential, evapotranspiration conditions and water quality*" [emphasis added]); General Statutes § 22a-373 (b) (6) ("effect, including thermal effect, *on fish and wildlife as a result of flow reduction, alteration or augmentation* caused by the proposed diversion" [emphasis added]); General Statutes § 22a-373 (b) (7) ("effect of the proposed diversion *on navigation*" [emphasis added]).

[33] After that threshold determination is made by the department, the plaintiff could submit an application for such diversion or the department could elect to bring an enforcement action pursuant to § 22a-376.

[34] This regulation, requiring technical analysis of, for example, "seven-day ten-year, seven-day two-year, thirty-day two-year, and annual average flows; [and] for high flows: peak flows corresponding to the probable maximum flood, half probable maximum flood, and 500-year, 100-year, [fifty]-year, [ten]-year, and [two]-year flood events and average annual flows"; Regs., Conn. State Agencies § 22a-377 (c)-2 (a) (2); lends support to the plaintiff's position that the information sought to evaluate the "effect of the proposed diversion on public water supplies, water quality, waste-water treatment needs, flood management, water-based recreation, wetland habitats, waste assimilation, agriculture, fish and wildlife and low flow requirements" in § 22a-369 (7) must have some hydraulic relationship to the proposed diversion.

[35] In a similar vein, the commissioner claims by analogy that, because its jurisdiction is only limited to the extent that the department determines that *any* of the plaintiff's activities no longer have an impact "upon 'waters' or water-related resources" or result in "alterations and modifications to the waters of the state," its *authority* must also encompass the plaintiff's excavation activities because they will change topography and watershed of the plaintiff's properties "in space and time due to the quarrying operation [which], relating to the waters of the state, [is] precisely what diversions are about—changes in the water regime . . . ." While this rationale may demonstrate that the excavation may be a diversion subject to the permitting requirements and therefore within the jurisdiction of the department, it does not demonstrate that the department properly exercises authority over such activities insofar as there may not be a hydraulic nexus between the proposed diversions and the excavation activities.

[36] See footnote 12 of this opinion (defining "area of influence" in § 22a-354b-1 (a) (3) of the Regulations of the Connecticut State Agencies, entitled "Regulations for Mapping Wells in Stratified Drift Aquifers to Level A

Standards").

[37] Specifically, the plaintiff claims that the department's jurisdiction should be defined physically because, after the water diversion act broadly encompasses most activities, the exemptions of § 22a-377 state volumetric and other physical criteria that define what diversions are exempted from the water diversion act, such as the exemption for withdrawals of water that do not exceed 50,000 gallons of water during any twenty-four hour period. General Statues § 22a-377 (a) (1). If the exemptions physically delineate the department's jurisdiction, then, by analogy, the department's *authority* to request information relating to a diversion should also be physically delineated, because failure to do so, according to the plaintiff, would be "at odds with the facts that each regulated diversion is a readily measurable and identifiable activity that occurs at a discrete location."

[38] In *Unistar Properties, LLC* v. *Conservation & Inland Wetlands Commission*, supra, 293 Conn. 95, the plaintiff sought approval of a proposed subdivision on lands adjacent to wetlands from a municipal wetlands commission. Although the defendant was statutorily required to consider the effect of the plaintiff's subdivision on wetlands habitats in and around wetlands or watercourses outside the area for which the activity was proposed, it could not deny or condition an application for a regulated activity in an area outside wetlands or watercourses " 'on the basis of an impact or effect on aquatic, plant, or animal life *unless such activity will likely impact or affect the physical characteristics of such wetlands or watercourses.*' " (Emphasis added.) *Unistar Properties, LLC* v. *Conservation & Inland Wetlands Commission*, supra, 293 Conn. 111, quoting General Statutes § 22a-41 (d). The plaintiff refused to provide the commission with a wildlife inventory for the nonwetlands portions of its property and, instead, the plaintiff presented expert testimony that its nonwetlands activities would not affect the physical characteristics of the wetlands on its properties. Id., 98. The defendant denied the plaintiff's application as incomplete on the ground that it required information to address concerns about wetlands impacts raised during the hearing. Id., 99.

This court rejected the plaintiff's claim on appeal that "its expert evidence had established that the proposed subdivision would not affect the wetlands, [and, therefore, that the defendant] could not, as a matter of law [pursuant to § 22a-41 (d)], deny the application as incomplete because it was not entitled to the information it requested, including a wildlife inventory." Id. This court concluded that, even if § 22a-41 (d) might have prevented the defendant from denying or conditioning an application in the absence of an effect of the nonwetlands activity on the physical characteristics of the wetlands, the wetlands act independently authorized the defendant to request a wildlife inventory in order to make that determination. Id., 111. We also concluded that the plaintiff could not "[shift] the burden of providing information to support its application from the applicant to the [defendant] itself and [place] the [defendant] in the role of disproving the plaintiff's assertion . . . ." Id., 112.

[39] We do not discuss whether each individual item in the October 21, 2008 letter is properly requested by the department pursuant to the water diversion act. The parties did not brief the authority granted by the water diversion act as to each item, but rather disputed the department's authority to regulate the plaintiff's excavation activities, generally.

[40] In light of our conclusion, we need not decide whether disturbance of wetlands pursuant to a duly issued municipal wetlands permit also requires a water diversion permit and, if so, what powers are properly exercised by the department pursuant to the water diversion act in light of any overlapping jurisdiction with local wetlands commissions. See *Sams* v. *Dept. of Environmental Protection*, supra, 308 Conn. 391–96. Nor do we decide whether it is feasible or proper to exercise the powers conferred by the water diversion act to activities that concluded decades earlier. See footnote 29 of this opinion.

[41] As discussed previously in this opinion, NPDES permits are discharge permits issued by the department pursuant to 33 U.S.C. § 1342 and General Statutes § 22a-430, which "require any person or municipality to obtain a permit prior to discharging any substance into the waters of the United States or Connecticut. In Connecticut, the department is responsible for issuing both federal and state discharge permits." (Internal quotation marks omitted.) *Burton* v. *Commissioner of Environmental Protection*, supra, 291 Conn. 793 n.4.

[42] The commissioner does not claim that the department's interpretation of § 22a-430-4 (d) (3) should be accorded any deference. See part III of

this opinion.

[43] We note that, in the declaratory ruling, the commissioner paraphrased § 22a-430-4 (d) (3) by characterizing the department's power to delay processing a completed discharge permit application as proper "when a related permit application" is incomplete or may be denied. The actual regulatory language, however, states that the department may delay processing a completed discharge permit application "if it is associated with another application" which is incomplete or may be denied. Regs., Conn. State Agencies § 22a-430-4 (d) (3). The commissioner's substitution of "a *related* permit application" for "*another* application" caused the commissioner's analysis of the regulation to omit any reference to the meaning of "another," and instead focused the parties on disputing the meaning of the word "related." Interpretation of the term "related" has little bearing on our resolution of this issue. Moreover, to the extent that the parties' interpretations of the word "related" bear on their interpretation of the regulatory language "associated with," even assuming these terms have substantially the same meaning, we disagree that this aspect of the regulation resolves the issue in the present case.

[44] According to the record before us, the department has never officially deemed the plaintiff's NPDES application complete. The record does not disclose whether the department has sent a notice of sufficiency to the plaintiff pursuant to § 22a-430-4 (d) (2) (A) and (B). Nonetheless, the parties principally dispute the department's authority to delay processing a completed NPDES application pursuant to the second sentence of § 22a-430-4 (d) (3). Therefore, we assume for purposes of this appeal that the plaintiff's NPDES permit application is complete, although we note that our analysis as to the first sentence of § 22a-430-4 (d) (3) would apply should the department conclude otherwise.

————————————————————